**Affirmed and Memorandum Opinion filed March 28, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00881-CV

## IN THE INTEREST OF M.M. AND C.M., CHILDREN

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 90237-F**

## MEMORANDUM OPINION

The issues in this case involve whether the district court's findings to terminate parents' parental rights are supported by legally and factually sufficient evidence. This accelerated appeal arises from a final order in which, after a hearing without a jury, the district court terminated the parental rights of D.W. (Mother) and C.M.S. (Father) with respect to their children, M.M. (Mary) and C.J. (Charles),[1] and appointed the Department of Family and Protective Services to be the children's sole

---

[1] To protect the minors' identities, we have not used the actual names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1).

Both parents appealed. In six issues, Mother challenges the legal and factual sufficiency of the evidence to support the district court's findings on the predicate ground of endangerment, that termination is in the children's best interest, and appointment of the Department as the children's sole managing conservator. Mother further argues she received ineffective assistance of counsel, the district court abused its discretion in denying her motion for continuance, and the district court improperly ordered new evidence in violation of Texas Rule of Evidence 605. Father challenges the legal and factual sufficiency of the evidence to support the district court's endangerment finding and the finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). We affirm.

## I. BACKGROUND

### A. Pretrial proceedings

#### 1. Pretrial removal affidavit

Early in 2017, more than one year before the final hearing commenced,[2] the Department received a referral stating that shortly after midnight law enforcement officers responded to a report by a Walmart employee that Mary and Charles had been left unattended in a car parked in the Walmart parking lot. While law enforcement officers were present, Mother appeared and identified herself as "Lawanda." Law enforcement officers later learned that Lawanda was Mother's neighbor. Mother and the children were transported to the police station where Mother dropped a small packet of methamphetamine on the floor. Mary tried to pick it up saying, "That is mommy's, and I need to save it." Mother admitted "being very

---

[2] The Family Code uses the terms "final trial" and "final hearing on the merits." *E.g.*, Tex. Fam. Code Ann. §§ 161.2011(a), .202. In this opinion we use either "final hearing on the merits" or "final hearing."

messed up on methamphetamine" and using Lawanda's identification card to impersonate her neighbor. Mother was arrested for possession of methamphetamine and reported there were no relatives available to care for the children. It was reported that "Father is hiding out in the area and may not be reachable."

Mary, who was five years old at the time, told an investigator that she and her brother stayed in the truck while Mother shopped in Walmart. Mary said she had to urinate in the truck because there was no one there to take her in the store. Mary also reported that Father had hurt Mother. Mary reported that "when my mom and dad play with crystals I can't be around them."

Law enforcement officers reported that Mother had been shoplifting in Walmart and was taken to the police station due to outstanding warrants. A dispatcher saw Mary pick up the bag of methamphetamine and told Mary to throw it away. Mary told the dispatcher the bag was not trash but belonged to Mother. Father also had outstanding arrest warrants.

Mother reported that she suffers from bipolar disorder and depression. Mother left her abusive husband who is a methamphetamine dealer. Mother possessed the methamphetamine because she took it from her abusive husband.

## 2. Criminal History

Mother had two traffic offenses, which were referred to the arresting agencies for disposition. Mother also had a charge for theft, which was listed as "disposition held."

Father had a prior conviction for criminal trespass. Father received deferred adjudication probation for three drug offenses and had his probation revoked on one drug offense. Father had other charges of criminal trespass, burglary of a building, failure to identify, and possession of a controlled substance, which were either

3

deferred or referred to the arresting agencies.

### 3. Department History

Approximately one year before the referral from the Walmart incident, the Department received a referral of physical abuse, physical neglect, and neglectful supervision of Mary, Charles, and S.M. (Susie).[3] The report noted that Mother was seen hitting Mary while Mary was playing outside. The home had no running water, severe sewage backup, and was infested with roaches. The children were sleeping on the living room floor. It was noted that no food was in the home and the children had been seen outside asking neighbors for food. It was further reported that strangers were "constantly coming and going due to the drugs being used in the home." Mother and Father were reported to be known users of heroin and methamphetamine. Mary was seen with burns on her shoulder that appeared to be approximately one week old. It was noted that the burns were dirty and appeared to be infected.

The investigation revealed that both Mother and Father "actively hide the family from CPS." The case was closed because the family fled the state and the Department could not locate them.

Four years earlier, the Department received a referral of neglectful supervision of Susie and Mary. The report noted that the children lived with Mother, Father, and a paternal uncle. The parents provided negative drug tests and the children were eventually returned to them. Other than the negative drug tests, the report does not list the reason the children were returned.

### 4. Removal

The children were removed on an emergency basis and family service plans

---

[3] Susie is Mother's oldest child who no longer lives with Mother.

were developed. The district court ordered the parents to provide support to the children and ordered compliance with the service plans. At the time of the removal Mother was arrested and incarcerated in the Brazoria County Jail.

## B.    Final Hearing

The case was initially called to a final hearing in June 2018. The district court announced that the parties agreed to start on that date, and recess at a later date in July. The witnesses were sworn, and the caseworker began her testimony with a statement that she works for the Department. The district court secured the parties' agreement that they would return in July to continue the hearing.

When the final hearing resumed in July, Mother was the only witness to testify the first day of the hearing. Mother testified that she was arrested for methamphetamine possession the day her children were removed. On the day of her arrest Mother did not know Father's location. The district court admitted, without objection, a certified copy of the judgment of conviction for possession of methamphetamine, which reflected that Mother pleaded guilty to the offense in exchange for a sentence of 150 days in the Brazoria County Jail.

Mother voluntarily admitted to the Santa Maria substance abuse treatment center. Mother completed a four-month program and was successfully discharged. Mother completed a psychological evaluation and parenting classes. Mother was unable to maintain stable employment or maintain a stable home. Mother had been homeless since being released from jail. Mother's family lived in Kentucky; if the children were returned to her she would take them to Kentucky.

The day the children were removed, Mother had visible bruises and a black eye. Mother claimed she went to the police station because Mary reported that the bruises were a result of physical abuse by Father. Mother went with the police

officers to document her bruises and meet with representatives from a women's shelter. Mother was arrested for possession of methamphetamine and spent the next 147 days in the Brazoria County Jail.

Mother testified that while the case was pending she was never asked to submit to a drug test. Mother admitted using methamphetamine after leaving treatment at Santa Maria. At the end of Mother's testimony, the district court ordered a drug test and recessed until August.

When the final hearing resumed, DNA tests were admitted into evidence that confirmed Father is the biological father of both children. Father's attorney requested a continuance because Father was sent to prison the Friday before the final hearing was to resume on Monday. At the time the final hearing was recessed, Father was in Brazoria County custody and was not expected to be transferred before the hearing resumed. Due to the late notice, counsel was unable to request a bench warrant for the August hearing date. The district court recessed until September.

When the final hearing resumed in September, Mother was not present. The hearing resumed with Father's testimony. At the time the hearing resumed, Father was serving a four-year sentence for possession of a controlled substance. At the time the children were removed, Father was also incarcerated. During the pendency of this case the only time Father had not been incarcerated was four months in 2018. When Father was released in 2018, he tried to call the Department caseworker. Father admitted a previous conviction for possession of a controlled substance in 2002. While in jail Father participated in parenting, anger-management, and life-skills classes.

Chevelle Bossier, the conservatorship caseworker, was designated to transport Mother to the drug-testing facility following the August hearing. Bossier called Mother and did not receive a return phone call. Bossier looked for Mother at two

motels where she was supposed to be staying and a residence in Clute where she had been staying. Bossier was unable to locate Mother. Mother did not communicate with Bossier after that hearing.

In addition to failing to complete parenting classes, individual therapy, or maintain employment, Mother failed to appear for random drug tests. Mother did not appear when the court requested a drug test, nor did she appear the previous month when the Department requested a drug test. The previous month Bossier drove mother to the drug-testing facility, but Mother refused to submit to the test.

Bossier testified that the children were in foster care and were in a safer environment. They were doing well in school and were loved unconditionally by their foster parents. Bossier testified that the foster parents have been more consistent in meeting the children's physical, medical, and educational needs than the parents were. Mother visited the children in March 2018 and again in August 2018, but did not visit them any time in between those two visits.

The foster father testified that he had been the children's foster parent for almost twenty months. When the children came into his care, Charles was two and Mary was four. When the children arrived in his care, they both had a "head full of lice and front teeth . . . on the top rotten to the gum line." Mary was very talkative, and Charles was just learning to talk. Charles's only words at the time were described as "vulgar." When Mary first came into care, she would not go to sleep unless the foster parents were in the room and watched her go to sleep. Charles would not be separated from Mary for any length of time.

Almost two years later, at the time of the final hearing, Charles was almost four years old and was "very happy and playful." Charles loved to read and play with friends from a church group. Some of Charles's favorite activities were going to the library and the park and riding his bike. Charles attended preschool two days

7

a week at a local church.

Mary, who was six at the time of the final hearing, was also doing well. The foster father testified that "art is her passion." Mary paints, draws, and enjoys "hanging out with her friends." Mary thrived on being able to go to school and was becoming more independent, making her own lunch and helping around the house. Teachers have given feedback that Mary is a sweet girl.

The foster father testified that he and his wife would like to adopt the children and believe they could provide a stable and loving environment. Their goal is for the children to be in a loving and caring environment even if it is not in their home.

The children's maternal grandmother (Grandmother) testified by video. Grandmother asked that the children be allowed to live with her in Kentucky. A children's services agency in Kentucky conducted a home study on Grandmother and denied placement with Grandmother. Susie, Mother's oldest child, was living with Grandmother at the time of the final hearing. Grandmother admitted a previous driving under the influence conviction. The caseworker testified earlier that the conviction was the reason Grandmother was rejected as a possible placement. At the time of the final hearing, Mother lived in the same town in Kentucky with her uncle.

At the conclusion of testimony, the district court found clear and convincing evidence that both parents had endangered the children pursuant to section 161.001(b)(1) of the Family Code. The district court further found that termination of the parents' rights was in the best interest of the children and that the Department should be appointed temporary managing conservator.

## II.   ANALYSIS

In the parents' first issues, Mother and Father challenge the legal and factual sufficiency of the evidence to support the district court's finding on the predicate

8

ground of endangerment. In Mother's fifth issue and Father's second issue the parents challenge the legal and factual sufficiency of the evidence to support the district court's finding that termination is in the best interest of the children.

## A. Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable

9

factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*; *In re D.R.A.*, 374 S.W.3d at 531. However, this does not compel us to disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (internal quotation marks omitted). We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection 1 of section 161.001(b) and that termination is in the best interest of the child under subsection 2. Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Predicate termination grounds

The district court made predicate termination findings that Mother had committed acts establishing the grounds set out in subsections D and E, and that Father committed acts establishing the ground set out in subsection E of section 161.001(b)(1), which provides for termination of parental rights if the fact finder finds by clear and convincing evidence that the parent has:

10

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

. . . [or]

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Only one predicate finding under section 161.001(b)(1) is necessary to support a final order of termination when the factfinder also finds that termination is in the children's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We will address the district court's findings of endangerment under subsection E.

"To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct. *Id.* at 360–61. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-

11

being. *Id.*

Drug abuse and its effect on the ability to parent can present an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d at 345; *see In re S.R.*, 452 S.W.3d at 361. Drug use can endanger a child "when the environment creates a potential for danger that the parent is aware of but disregards." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

### 1.    Mother

The children were removed because Mother left them alone in a car while she went into a store where it was alleged she was shoplifting. Mother did not know Father's location and could not identify any other placement for the children. Due to lack of resources for the children, law enforcement officers transported Mother and the children to the police station where Mother dropped a packet of methamphetamine on the floor. Mary, five-years old at the time, picked up the methamphetamine, identified it as belonging to "Mommy," and said she needed to save it for Mommy.

Mother argues that the Department presented no evidence about its initial decision to seek removal because none of its investigators testified. The removal affidavit, however, was attached to the Department's original petition for termination. Because the removal affidavit is in the court's file, we presume the district court took judicial notice of its record without any request being made and without any announcement that it had done so. *See In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Therefore, the district court could consider the removal affidavit when making its finding of endangerment.

Mother further argues that there is no evidence her conviction for possession of methamphetamine endangered her children. Subjecting a child to a life of

12

uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345. Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection (E). *See In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *8 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.); *In re C.A.B.*, 289 S.W.3d 874, 886 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Likewise, illegal drug use may support termination under subsection (E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). This court has held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.).

Mother testified that the Department had not required her to submit to drug testing while the case was pending. Mother, however, admitted using methamphetamine after discharge from substance-abuse treatment. When the district court requested that Mother submit to drug testing and arranged for transportation to the facility, Mother did not appear. Mother's refusal to submit to drug testing, which could have revealed continued methamphetamine use, may be treated by the district court as if she had tested positive for drugs. *See In re E.R.W.*, 528 S.W.3d at 265; *In re C.A.B.*, 289 S.W.3d at 885. Even without considering her refusal to submit to drug testing, Mother's admission of illegal drug use after the children were removed supports the district court's endangerment finding. *See In re S.R.*, 452 S.W.3d at 361–62 (continued drug use after child's removal may be considered as establishing

endangering course of conduct).

Considered in the light most favorable to the district court's finding, we conclude that the evidence is legally sufficient to support the district court's termination of Mother's parental rights under section 161.001(b)(1)(E) under these circumstances. Likewise, viewing the entire record, we conclude any disputed evidence is not so significant as to prevent the district court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude that the evidence is factually sufficient to support the subsection E predicate finding.

In light of this conclusion, we need not address the district court's finding on subsection D. *See In re A.V.*, 113 S.W.3d at 362. We overrule Mother's first issue.

### 2. Father

Father argues the Department provided no evidence that Father continued to engage in a course of conduct to endanger the children or place the children with anyone who would endanger them. Father emphasizes that while incarcerated he underwent substance-abuse treatment and other classes to help him when he was released. Father further argues there was no evidence that he engaged in any behavior that would endanger the children.

The record reflects that in 2014 Father received deferred-adjudication probation in exchange for a guilty plea to possession of a controlled substance. Father violated his probation and was incarcerated at the time the children were removed. During the pendency of this termination, Father was out of jail for a total time of approximately four months. To his credit, knowing he was going back to jail, Father attempted to find a place for Mother and the children to live.

As noted above, intentional criminal activity that exposes a parent to

14

incarceration is conduct that endangers the physical and emotional well-being of a child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment."); *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (parent's past criminal conduct, before and after child's birth relevant to showing of inability to parent); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that father's imprisonment, along with drug use, criminal conduct, and allowing child to live with known drug users, constitutes endangerment).

In *Boyd*, the father of the child was in jail at the child's birth. 727 S.W.2d at 533. He saw the child eight months later upon his release on parole, lived with her for five months, and then returned to jail for burglary. *Id*. The evidence was "vague, at best" as to whether he ever supported the child. *Id*. He was not married to the mother, and no adjudication of paternity took place until the termination hearing. *Id*. at 532. Reversing the court of appeals, the Texas Supreme Court concluded that such evidence can support a termination finding based on endangerment. *Id*. at 533. The court expressly disagreed with the court of appeals' conclusion that danger under subsection E "cannot be inferred from parental misconduct." *Id*.

The court's holding in *Boyd* continues unabated. In *In re J.O.A.*, the supreme court reversed the court of appeals and determined the evidence was legally sufficient to support the trial court's termination of the father's rights based on endangerment without any bad conduct directed toward the children involved. *In re J.O.A.*, 283 S.W.3d at 345–46 (Tex. 2009). It did so because: (1) the father "had a history of domestic violence" toward the mother and had admitted to daily marijuana use,[4] and (2) he was incarcerated on criminal charges that were later dismissed. *Id*.

---

[4] The supreme court explained that "a parent's use of narcotics and its effect on his or her

at 346. The supreme court found sufficient evidence of endangerment despite the father's efforts, after Department involvement, to improve: engaging in supervised visits with his children, securing steady employment, and completing parenting classes. *Id*. In *J.O.A.*, the high court reaffirmed the principle in *Boyd* that "endangering conduct is not limited to actions directed toward the child." *Id*. at 345 (quoting *Boyd*, 727 S.W.2d at 533).

Here, Father has an extensive criminal history dating back to 1997, including the 2014 drug charge. He was incarcerated at the time of removal and during the entire hearing. He was incarcerated when the final hearing terminating his parental rights took place. While not conduct directed at his children, such conduct is clear and convincing support for the district court's termination decision based on the ground of endangerment because the conduct placed his children in jeopardy. *In re J.O.A.*, 283 S.W.3d at 347; *Boyd*, 727 S.W.2d at 533–34; *see also In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (criticizing court of appeals for failing to account for father's pattern of conduct that is "inimical to the very idea of child-rearing," including conduct displaying criminal proclivities and fact that father had seen child only twice).

Considered in the light most favorable to the district court's finding, we conclude that the evidence is legally sufficient to support the district court's termination of Father's parental rights under section 161.001(b)(1)(E) under these circumstances. Likewise, viewing the entire record, we conclude any disputed evidence is not so significant as to prevent the district court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude that the evidence is factually sufficient to support the

---

ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345.

subsection E predicate finding. We overrule Father's first issue.

## B.  Best Interest of the Children

In Mother's fifth issue and Father's second issue, the parents challenge the legal and factual sufficiency of the evidence to support the district court's finding that termination of their parental rights is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d at 533. However, prompt and permanent placement of the child in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See id.* The considerations that the fact finder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future physical and emotional danger to the children;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re S.R.*, 452 S.W.3d at 366; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72; *In re S.R.*, 452 S.W.3d at 366.

In reviewing the legal and factual sufficiency of the evidence to support the district court's finding on best interest, we are mindful of the fact that the focus in a best-interest analysis is not only on the parent's acts or omissions, but on the nature of the relationship the child has with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

## 1. The desires of the children

The children were removed when Mary was five and Charles was three. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

The foster father testified that the children had lived with him and his wife for almost twenty months. During that time the foster parents obtained needed medical and dental care for the children and helped them cope with sleeping difficulties. By the time of the final hearing, Charles loved to read and play with friends that the foster parents attend. Charles was attending preschool and was described as "very happy and playful." Mary was thriving in school and demonstrated an aptitude for art. Mary was beginning to become more independent helping her foster parents around the house.

18

Mother argues that the children gave Mother a hug at one of their visits with her and that they have asked to see their older sibling who lives in Kentucky. At the time of the final hearing, however, Mother admitted she did not have a stable home. Father has been incarcerated for almost all of Charles's life and several years of Mary's life. The district court reasonably could have weighed this factor in favor of termination.

## 2. Present and future physical and emotional needs of the children and present and future physical and emotional danger to them

"Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.* Mother argues the children had no special needs. While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met every day. The record reflects that at the time they came into care, Mary and Charles had greater physical and emotional needs than the average child. Neither parent was meeting those needs as evidenced by the fact that the children had a severe lice infestation and needed extensive dental care.

Mother and Father argue there was no evidence that they were a danger to the children. Mother argues "the only concerns [the Department] had when [the children] came into care was lice in children's hair and a few teeth were rotting." However, the record reflects that Mother used methamphetamine while the children were in her care, continued to use drugs even after her children were removed, and lacked stable housing. The children came into care because Mother left them alone in a car in a store parking lot. Father was convicted of possession of a controlled substance and was incarcerated almost the entire time this case was pending. In

19

addition, Father did not act to prevent the lice infestation or severe decay of the children's teeth while the children were in his care. A factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness to meet the children's needs in the future. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Continued drug use not only may be considered as establishing an endangering course of conduct, but also that termination is in the child's best interest. *In re B.Z.S.*, No. 14-16-00825-CV, 2017 WL 536671, at *5 (Tex. App.— Houston [14th Dist.] Feb. 9, 2017, pet. denied) (mem. op.). The record also reflected that Mother's housing situation was not stable. Evidence of a parent's unstable lifestyle also can support the conclusion that termination is in the child's best interest. *In re A.R.M.*, 2014 WL 1390285, at *10.

The district court reasonably could have weighed this factor in favor of termination.

### 3. Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody

These related factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother argues there was no direct testimony as to her parenting abilities or that she had abused her children. Mother also emphasizes her voluntary submission to substance-abuse treatment. Father argues there is no evidence that he has been a direct danger to the children. Both parents argue that the Department did not adequately consider placement of the children with Grandmother.

A court may consider whether a parent demonstrated willingness to effect

positive environmental and personal changes within a reasonable amount of time to address unsafe issues. *See* Tex. Fam. Code Ann. § 263.307(b)(11). To be sure, Mother demonstrated willingness to obtain treatment for her substance abuse. However, Mother admitted continuing to use methamphetamine after discharge from treatment. Mother was unable to obtain and maintain employment or maintain stable housing. The record demonstrates that Mother continued to abuse methamphetamine even with the knowledge that by doing so she was risking termination of her parental rights.

This court and others have found sufficient evidence to support a best-interest finding despite evidence of lifestyle improvements made while a parent's child is being cared for by others. *See In re A.C.B.*, 198 S.W.3d 294, 299–300 (Tex. App.—Amarillo 2006, no pet.) (notwithstanding post-removal improvement and performance of service plan, prior endangering conduct could support termination); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue"). Mother's past behavior and testimony at the final hearing do not indicate that her rehabilitation "will surely continue."

Both parents argue termination is not in the best interest of their children because the Department erred in failing to place the children with Grandmother. In enabling the Department to give preference to a relative of children if placement with the noncustodial parent is inappropriate, the district court has broad discretion in determining the best interest of the children. *See In re K.P.C.*, No. 14-17-00993-CV, 2018 WL 2106669, at *12 (Tex. App.—Houston [14th Dist.] May 8, 2018, pet. denied) (mem. op.). The determination of where children will be placed is a factor in determining the children's best interest, but the fact that placement will be with

non-relatives is not a bar to termination. *In re A.L.*, 389 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The record reflects that the Department worked with its equivalent agency in Kentucky to determine if Grandmother was an appropriate placement. The Kentucky agency reported not only Grandmother's driving-under-the-influence conviction, but also several convictions of others living in Grandmother's home.

By contrast, the foster parents are providing the children with a safe and stable home environment. Despite the state of the children's medical and dental health at the time they came into care, the children were thriving at the time of the final hearing and happy with the friends they had made while living with the foster parents. The Department's long-term permanent placement plan is for the foster parents to adopt the children. *See In re C.H.*, 89 S.W.3d at 28 (evidence about placement plans and adoption is relevant to best interest). The district court could have weighed these factors in favor of termination.

### 4. Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions

Mother left a five-year-old and a three-year-old in a car alone while she went into a store. Mother continued to use methamphetamine throughout the pendency of the parental-termination proceedings. Rather than submit to a court-ordered drug test, Mother disappeared. After refusing the drug test, Mother did not appear at the next hearing setting. Neither parent had a home in which the children could live. The parents' continued pattern of irresponsible conduct reflects that termination is in the children's best interest. The district court reasonably could have weighed these factors in favor of termination.

Under all the circumstances in this case and applying the applicable *Holley*

22

factors to all the evidence, we conclude that legally- and factually-sufficient evidence supports the district court's finding that termination of the parents' parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Mother's fifth issue and Father's second issue.

## C.    Conservatorship

In her sixth issue, Mother argues the evidence is legally and factually insufficient to support the district court's finding that appointment of the Department as sole managing conservator is in the best interest of the children.

We review a district court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case in which the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the district court had sufficient information upon which to exercise its discretion and (2) whether the district court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (Supp.). The district court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re N.W.L.T.*, No. 14-18-

23

00497-CV, 2018 WL 6217313, at *11 (Tex. App.—Houston [14th Dist.] Nov. 29, 2018, pet. denied) (mem. op.). Having determined that the evidence is sufficient to support the best-interest finding, we conclude the district court had sufficient information upon which to exercise its discretion and did not abuse its discretion in appointing the Department as sole managing conservator of the children. *See In re L.G.R.*, 498 S.W.3d at 207 (holding no abuse of discretion in conservatorship finding in which evidence was sufficient to support termination of parental rights). We overrule Mother's sixth issue.

**D.     Ineffective assistance of counsel**

Having determined that neither parent is entitled to rendition of judgment based on legally-insufficient evidence, we turn to Mother's complaint against her former appointed trial counsel. In her third issue Mother argues she was denied effective assistance by her prior counsel, which prevented her from adequately presenting her case at the final hearing.

Approximately one month after the children's removal, the district court found that Mother could not afford to retain an attorney and appointed counsel to represent her in the parental-termination proceeding. Almost one year later, the attorney was indicted for official oppression, described as soliciting sexual conduct for a fee from Mother. Three offenses were alleged to have occurred during the period of time Mother's counsel represented her. One month before Mother's prior counsel was indicted, and six months before the final hearing began, the district court appointed a new attorney for Mother. Mother contends her trial counsel rendered ineffective assistance because:

- Her first court-appointed counsel was indicted for an alleged offense committed against her;
- the presence of Father's trial counsel during the final hearing

24

caused Mother to be distraught and unable to present her testimony;

- Mother's substituted trial counsel was hindered in the presentation of Mother's "case" because Mother was unable to focus; and

- Mother was so distressed that the district court had to repeatedly ask her to focus and calm down.

On cross-examination, Mother's attorney elicited the following testimony:

Q. Now you've been having a difficult time while you've been on the stand?

A. Yes, ma'am.

Q. Would that be accurate?

A. Yes, ma'am.

Q. Did something happen to you at the courthouse that is causing you to have additional problems?

A. Yes, ma'am.

Q. And when did that happen?

A. After I got out of jail, the first encounter happened the week after I got out of jail. And then the first time I came to Court, after Court it happened in the courthouse.

. . . .

Q. (By [Mother's attorney]) Can you explain to the Judge what happened?

A. Yes, ma'am. I was sexually assaulted by my Court appointed attorney, CPS.

Q. And you know that there's an ongoing investigation with that matter?

A. I don't know about that but I know I've talked to a grand jury about it. And the DA just came up to me just a minute ago and I have to talk to them later, too, about it.

Q. So how does that affect you when you come into the courthouse?

A. A lot, because his friend's in here.

THE COURT: His what?

THE WITNESS [Mother]: His friend, someone that's very close to him.

THE COURT: Okay. And you said a DA approached you?

THE WITNESS: Yes, sir.

THE COURT: While you were —

THE WITNESS: Not in here but in the courthouse, yes, sir.

THE COURT: Who is that?

THE WITNESS: I have the name in my purse.

THE COURT: You don't know the name of the person that approached you?

THE WITNESS: No, sir, I don't.

THE COURT: A man or woman?

THE WITNESS: Man.

THE COURT: Tall, short?

THE WITNESS: Tall and he said that he would like to further give me his phone number and there's some things he needed to talk to me about.

THE COURT: Okay. Go ahead.

Q. (By [Mother's attorney]) As a result of that assault, have you had to have — have you been given any kind of therapy or had opportunity to speak to a therapist?

. . . .

Q. (By [Mother's attorney]) When you used the word "assaulted," were you physically touched?

A. Yes, ma'am.

Q. Were you touched offensively?

A. Yes, ma'am.

Q. And you indicated this was by your former lawyer?

A. Yes, ma'am.

Q. You testified earlier that everything was a blur to you when [the Department's attorney] was trying to establish the timeline. Does that

event have anything to do with your memory being blurry?

A. Yes, ma'am.

Q. On how many occasions were you assaulted?

A. Four different times.

Q. Four different times?

A. Yes, ma'am.

Q. Within what time period?

A. From the week that I got out of jail to — I know I'm going crazy saying this, but I don't know. It was over a couple of months, you know what I mean? Like a period of a month I guess.

Q. Now what are you asking the Court to do in this case?

A. What am I asking them?

Q. Yes. What are you asking the Judge to do?

A. Let me and my kids go home.

Parents who cannot afford to retain counsel in Texas parental-termination cases enjoy a right to appointed and effective counsel. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We apply the established *Strickland* test in parental-termination proceedings. *Id.* at 545 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under *Strickland*, to establish an ineffective-assistance claim, we review two "prongs." parent First, the parent must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the parent must show that the deficient performance prejudiced the case. This requires showing that counsel's errors were so serious as to deprive the party of a fair trial; a trial whose result is reliable. *Strickland*, 466 U.S. at 687. In other words, a parent must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the parent's case. *In re M.S.*, 115 S.W.3d at 545.

To determine whether representation was deficient, we must consider all of

27

the circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id*. In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (quoting *Strickland*, 466 U.S. at 689). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance deficient. *Id*. (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *In re M.S.*, 115 S.W.3d at 550. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, the parent must also show that "counsel's deficient performance prejudiced the defense." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d at 209. We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions. *In re Z.M.R.*, No. 14-18-00461-CV, 2018 WL 5660725, at *8–9 (Tex. App.—Houston [14th Dist.] Nov. 1, 2018, no pet. h.) (mem. op.).

Mother bears the burden of demonstrating there is a reasonable probability her parental rights would not have been terminated if not for her former counsel's conduct. *See In re V.V.*, 349 S.W.3d 548, 559–60 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). In her brief Mother alleges no error of her trial counsel, but argues

28

that the alleged offense committed by the previous counsel cause her to be a nervous and unfocused witness. Mother has not shown that if previous counsel had not allegedly committed an offense the results would have been different.[5]

In light of the evidence in support of the district court's findings, Mother has not established that but for the alleged deficiencies in her previous counsel's performance a different outcome would have resulted. *See In re L.G.R.*, 498 S.W.3d at 210. The record does not affirmatively show a reasonable probability that, but for the conduct of Mother's previous counsel, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, we hold that under the two-pronged *Strickland* test, Mother has failed to show that her trial counsel's alleged behavior prejudiced her defense. *See In re M.S.*, 115 S.W.3d at 544. We overrule Mother's second issue.

## D.  Motion for Continuance

In her third issue Mother contends the district court erred in denying her motion for continuance. When final hearing resumed in September 2018, Mother was not present. Mother's attorney filed a handwritten motion for continuance in which she stated that Mother was living in Kentucky and was unable to make the trip to Texas after having traveled for the previous hearing setting in August. The motion was not supported by affidavit.

Before the district court, Mother's attorney explained that Mother and her parents lived in Kentucky and had to travel to Texas for the final hearing. Counsel spoke with Mother the Saturday before the final hearing and expected her to be at the hearing in September. Counsel had not heard from Mother since that date.

---

[5] Mother has alleged that her previous counsel committed serious misconduct. We, however, must review how this alleged misconduct affected the defense from the new counsel who represented her at the final hearing.

Counsel requested a continuance to allow Mother to appear. Counsel pointed out that Father had received a continuance when he was unable to appear. The district court explained that Father's inability to appear was not within his control, which is why a continuance was granted. The district court further noted that Mother did not appear when ordered to submit to drug testing following the July hearing. The district court denied the motion for continuance.

Mother argues that the district court's denial of her motion was arbitrary and unreasonable. Texas Rule of Civil Procedure 251 governs motions for continuance. A motion for continuance shall not be granted without "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251; *see* Tex. Fam. Code Ann. § 105.003 ("proceedings shall be as in civil cases generally"). Accordingly, motions for continuance generally must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit. *In re Marriage of Harrison*, 557 S.W.3d 99, 112 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). When a motion for continuance does not comply with the rules—for example, when the motion is unwritten or unsupported by verified facts—appellate courts generally presume the trial court did not abuse its discretion in denying the motion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *see also In re S.M.H.*, 523 S.W.3d 783, 797 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Mother's handwritten motion for continuance was not supported by affidavit. Further, the record affirmatively reflects that the Department objected to Mother's request for the continuance. Finally, Mother has not shown that the continuance was required by operation of law. We also note that mere absence of a party does not automatically entitle Mother to a continuance. *See Vickery v. Vickery*, 999 S.W.2d 342, 363 (Tex. 1999); *In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *7

30

(Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.). Finding no abuse of discretion, we overrule Mother's third issue.

### E. Violation of Texas Rule of Evidence 605

In her fourth issue Mother argues the district court abused its discretion by introducing evidence in violation of Texas Rule of Evidence 605. The rule states, "The presiding judge may not testify as a witness at trial. A party need not object to preserve the issue."

On cross-examination by Father's counsel, Mother testified about the potential for the return of her children as long as she continued prescribed medication:

Q. So that's how far you've got in all of this. You were like this close to the children being returned to you. Correct?

A. Yes, ma'am.

THE COURT: When was that?

MS. LANDRY [Father's attorney]: In June?

MS. BONNER [Mother's attorney]: April.

THE COURT: Of this year?

MS. BONNER: Yes, sir.

MS. LANDRY: Yes, sir.

Q. (By Ms. Landry) And you're telling the Court since then you haven't used any other substances?

A. Yes, ma'am.

Q. And you're willing to participate in any additional services that the Judge would order. Right?

A. Yes, ma'am.

THE COURT: Hold on a second. If the Court ordered her to go take a drug test today, would CPS be able to accommodate that?

MS. SAMMONS: They close at 5:00 and the closest one is Freeport.

THE COURT: You don't think she could get there?

MS. SAMMONS: I think the cut off is 4:30.

MR. DIEYE: Unless you call and make a request.

The district court, Mother, and the attorneys then engaged in a discussion about finding Mother a place to sleep that night and ensuring her transportation to the drug-testing facility the next morning. After they arranged lodging and transportation for Mother the following colloquy occurred:

> THE COURT: We're back on the record. [Mother], you're working out where, what hotel or motel you're going to stay at this evening?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: You're ordered to provide that information to Ms. Sammons or her designee, either her or a caseworker. And then CPS is ordered to send a caseworker or two to that location at 9:00 a.m. in which case you're ordered to go with them to report for your drug test. You're ordered to submit to hair and urine testing.
>
> THE WITNESS [Mother]: Uh-huh. Why is that now? So why didn't that happen in the beginning?
>
> THE COURT: Ma'am, if you thought that I —
>
> THE WITNESS: I was just asking.
>
> THE COURT: — was going to answer your questions, like I was on trial.
>
> THE WITNESS: My bad. I was just asking. That's it. I'm sorry.

Mother further complains that the district court took judicial notice of a judgment of conviction. When Mother was testifying about the day the children were removed, while being questioned by her attorney, the following occurred:

> Q. So your children were taken because you —
>
> A [Mother]. I went to jail.
>
> Q. Because you went to jail?
>
> A. Yes, ma'am.

THE COURT: Hold on. The offense of possession of a controlled substance. Is that what you were convicted of?

THE WITNESS: Yes, sir. But they found it on the floor at the Angleton Police Station. They didn't find it on me.

MS. BONNER [Mother's attorney]: I think that was — she was charged with two charges I think.

THE WITNESS: I had one was — I'm sorry.

MS. BONNER: I think that was appeal bond.

THE COURT: Concurrent sentence?

MS. BONNER: Hold on a second, Judge.

THE COURT: Concurrent with what?

MS. BONNER: With the theft.

THE COURT: Hold on. What's that? Was she charged with theft that day?

THE WITNESS: No, sir, I was not.

THE COURT: Theft on a different day?

THE WITNESS: Yes, sir.

THE COURT: Okay. So you said you've never been to jail before this one time.

THE WITNESS: Oh, I'm so sorry.

THE COURT: Oh, so there was another theft.

THE WITNESS: There's only one.

THE COURT: I mean, there was another arrest.

THE WITNESS: Yes, five days in jail at Brazoria County. My parents bonded me out. It was a theft at Walmart, yes, sir, you're correct. My bad. I wasn't trying to hide anything.

THE COURT: That was back in 2016?

THE WITNESS: Since I've been here in Texas, yes, sir.

THE COURT: Theft of property worth more than 100 but less than 750?

THE WITNESS: Yes, sir.

THE COURT: Looks like the plea took place on the same day.

THE WITNESS: Concurrent maybe?

THE COURT: So Court takes judicial notice of a judgment of a conviction for theft of property of more than or equal to $100 and less than $750 for an offense occurring March 24th, 2016. So looks like there's two convictions. One is for theft; the other is for possession? And those are the only two times you've ever been arrested?

THE WITNESS: Yes, sir.

THE COURT: You haven't been arrested since then?

THE WITNESS: No, sir.

THE COURT: Okay.

On appeal, Mother argues the district court violated Texas Rule of Evidence 605 by (1) taking judicial notice of evidence not in the record or offered by the parties, and (2) in ordering a drug test. Mother relies on *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003), in which the supreme court likened a violation of Rule 605 to an impermissible comment on the weight of the evidence. *Id.* Mother does not argue on appeal that the sua sponte order for drug testing constituted impermissible discovery during the final hearing. *Cf. F.A.B. v. Dep't of Family & Protective Servs.*, No. 01-10-00930-CV, 2012 WL 5310024, at *6 (Tex. App.—Houston [1st Dist.] Oct. 25, 2012, no pet.) (mem. op.) (holding issue regarding drug testing ordered by district court during hearing was not preserved for appellate review).

In analyzing a complaint under Rule 605, "[t]he question should be whether the judge's statement of fact is essential to the exercise of some judicial function or is the functional equivalent of witness testimony." *Hammond v. State*, 799 S.W.2d 741, 746 (Tex. Crim. App. 1990) (quoting 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Federal Rules of Evidence* § 6063 (1990)).

We note at the outset that the underlying proceeding before the judge as factfinder, rather than a jury, in which the harm from the judge commenting on the

evidence would be much greater. *See In re E.L.W.*, No. 11-16-00010-CV, 2017 WL 390825, at *3 n.2 (Tex. App.—Eastland Jan. 26, 2017, no pet.) (mem. op.). Here, the judge's questioning of the witness and statements did not have the effect of conveying factual information not in evidence. As to the district court's taking of judicial notice of Mother's prior theft conviction, Mother admitted the conviction in court. Further, the sua sponte order for drug testing was not testimonial. We conclude that the district court's actions did not constitute a violation of Rule 605. *See In re C.C.K.*, No. 02-12-00347-CV, 2013 WL 452163, at *33 (Tex. App.–Fort Worth Feb. 7, 2013, no pet.) (mem. op.). We overrule Mother's fourth issue.

### III.   CONCLUSION

The evidence is legally and factually sufficient to support the district court's finding of endangerment as to both parents under section 161.001(b)(1)(E). And, based on the evidence presented, the district court reasonably could have formed a firm belief or conviction that terminating both parents' parental rights and appointing the Department as managing conservator was in the children's best interest so that they could promptly achieve permanency through adoption. *See In re M.G.D.*, 108 S.W.3d at 513–14.

Having overruled each of the parents' issues on appeal, we affirm the final order of termination.


/s/     Charles A. Spain
         Justice


Panel consists of Justices Wise, Zimmerer, and Spain.


35